**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IOENGINE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GARMIN LTD., GARMIN INTERNATIONAL, INC., and GARMIN USA, INC.,<br><br>Defendants. | Civil Action No. ___________________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff IOENGINE, LLC ("IOENGINE") files this Complaint against Defendants Garmin Ltd., Garmin International, Inc., and Garmin USA, Inc. (collectively "Garmin"), and in support thereof alleges as follows:

**NATURE OF THE ACTION**

1. IOENGINE's founder, Scott McNulty, has spent his career developing, commercializing, and marketing cutting edge technology. Fresh out of college, Mr. McNulty's first job was at a Madison Avenue advertising agency. Though he worked on award-winning campaigns for clients ranging from Coca-Cola to W.R. Grace, he found himself gravitating to projects focused on the latest consumer technology products. This experience led him to develop advertising campaigns for some of the era's most important technological innovations, including the first filmless camera, an early cellular telephone, and a new generation of televisions. His work earned some of advertising's highest honors, including multiple Clio Awards and the prestigious Gold Lion at the Cannes International Advertising Festival.

2. In the early 1990s, Mr. McNulty was recruited away from advertising and into

product development at a major technology company. There, he served as the product manager for the Zip drive, a highly portable data storage system whose disks stored 70x the amount of data and were 85x faster than existing floppy drives. That work immersed him in the data storage technologies of the day, and set the stage for the inventions at issue in this case.

3. While attending the Consumer Electronics Show in 2001, Mr. McNulty saw data storage devices implementing the then just-released USB 2.0 standard. He recognized that these small USB keys—each with its own processor, memory, and storage—were not merely hard drives, but computers in their own right. And that their capabilities would grow in the coming years. This led him to ponder the implications of cheap, tiny computers everywhere.

4. But he soon realized that a computer the size of a USB stick was too small to have its own input/output mechanisms, such as a keyboard, mouse, or screen. This posed a challenge. Miniature computers would be of limited use if you cannot meaningfully engage with them. The apparent solution, connecting the small device to a larger host computer, created a different problem. Under the then-ubiquitous control paradigm, giving a host computer access to a portable device meant surrendering the portable device to the host's complete control, and with it the security of the data the device carried.

5. Mr. McNulty took a different approach. He conceived of a portable device that carried its own processing and memory resources and was specially programmed so that it could communicate with, and even commandeer, a larger device (such as a desktop or laptop computer). This would allow the devices to retain the benefits of being small (e.g., extreme portability), but also accessible through traditional user interfaces, all while safeguarding the device's data.

6. Mr. McNulty also anticipated that data would increasingly live on network servers instead of local drives, and that his new class of portable devices would therefore need network

access. So he developed the software and communication protocols that let a portable device "tunnel" through a larger device and use its network connection—or, if necessary, access those same resources using the portable device's own network connection—in each case without compromising the security of either device.

7. Mr. McNulty founded IOENGINE to commercialize these inventions. The name reflects the central concept: an engine for the input and output needs of a new class of highly portable computing devices. IOENGINE hired engineers, built dozens of working prototypes, and disclosed its work to the public through the patent system, which has issued IOENGINE more than 15 patents.

8. What Mr. McNulty invented in the early 2000s enables Garmin's modern smartwatches. A Garmin smartwatch is a highly portable computer with its own processor, memory, and storage. It is set up, configured, and operated through an interactive user interface that Garmin's software presents on the larger, familiar screen of a paired smartphone, tablet, or laptop. It reaches Garmin's servers and third-party servers both through the smartphone's network connection and, on Wi-Fi-equipped models, through its own. And it does so securely, so that the data it carries about its wearer is protected in transit. Garmin's wearable business is built on precisely the architecture and protocols that Mr. McNulty conceived, disclosed, and patented.

9. The patent system is designed to encourage innovation and the disclosure of new ideas by granting inventors exclusive rights to their inventions for a limited period in exchange for teaching the public how those inventions work. Those rights reward individual ingenuity, and they preserve a marketplace in which technological progress is driven by creativity and merit. Garmin has made extensive, unauthorized use of IOENGINE's patented technology without seeking a license or paying compensation. This case seeks to ensure that the rights of the inventor are

acknowledged and respected.

## THE PARTIES

10. IOENGINE is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 22 Ensign Road, Norwalk, Connecticut 06853. IOENGINE was founded by Scott McNulty, the sole named inventor of the patents asserted in this action, and IOENGINE owns those patents.

11. On information and belief, Garmin Ltd. is a corporation organized and existing under the laws of Switzerland, with its principal place of business at Mühlentalstrasse 2, 8200 Schaffhausen, Switzerland. Garmin Ltd.'s shares are publicly traded on the New York Stock Exchange under the symbol GRMN, and Garmin Ltd. states that its principal subsidiaries are located in the United States, Taiwan, and the United Kingdom.[1]

12. On information and belief, Garmin International, Inc. is a corporation organized and existing under the laws of the State of Kansas, with its principal office at 1200 East 151st Street, Olathe, Kansas 66062. Garmin International, Inc. is a subsidiary of Garmin Ltd. and maintains an established place of business at 515 Lincoln Road, Miami Beach, FL 33139.

13. On information and belief, Garmin USA, Inc. is a corporation organized and existing under the laws of the State of Kansas, with its principal office at 1200 East 151st Street, Olathe, Kansas 66062. Garmin USA, Inc. is a subsidiary of Garmin Ltd. and maintains an established place of business at 515 Lincoln Road, Miami Beach, FL 33139.

14. On information and belief, in all respects relevant to the products accused of infringement in this Complaint, Garmin Ltd., Garmin International, Inc., and Garmin USA, Inc.

---

[1] *See* Ex. 5, *Garmin announces fourth quarter and fiscal year 2025 results*, GARMIN (Feb. 18, 2026), https://www.garmin.com/en-US/newsroom/press-release/corporate/garmin-announces-fourth-quarter-and-fiscal-year-2025-results/.

acted in concert with one another in designing, making, using, importing, offering for sale, and selling those products in the United States.

## JURISDICTION AND VENUE

15. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, including but not limited to 35 U.S.C. § 271.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

17. This Court has personal jurisdiction over Garmin. On information and belief, Garmin is subject to this Court's general and specific personal jurisdiction consistent with due process and the Florida long-arm statute, Fla. Stat. § 48.193, due to its (i) substantial and continuous business in this forum, including the commission of at least a portion of the infringing acts alleged herein; (ii) registration to transact business in Florida and maintenance of a registered agent in this District; and (iii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from infringing goods and services provided to persons and entities in Florida.

18. On information and belief, within this State, Garmin has offered for sale and sold, and continues to offer for sale and sell, products embodying the patented inventions, thereby committing acts of patent infringement alleged herein. Garmin does so through its own website and retail channels, through national and regional retailers with stores in this District, and through authorized Garmin dealers located in this District. On information and belief, Garmin also provides warranty service, technical support, software updates, and cloud services to purchasers and users of those products who reside in this District.

19. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because,

among other reasons, Garmin has committed at least a portion of the infringing acts at issue in this case from and within this District and has a regular and established place of business in this District at 515 Lincoln Road, Miami Beach, FL 33139. On information and belief, Garmin employs a number of persons in this District, including at that facility, and derives and has derived substantial revenue from goods and services provided to persons or entities in this District and from infringing acts occurring within this District.

20. The facility at 515 Lincoln Road, Miami Beach, Florida 33139 is a Garmin retail store.[2] It is the only Garmin retail store that Garmin identifies in the United States. It is a physical place in this District, it is a regular and established place of business, and it is Garmin's own: Garmin holds it out to the public as its store, staffs it with Garmin personnel, and controls its hours and operations.

21. Acts of infringement occur at the Lincoln Road store. On information and belief, Garmin sells and offers to sell the Accused Products at that store, including the smartwatches and fitness bands identified below. Each such sale and each such offer for sale is an act of direct infringement under 35 U.S.C. § 271(a) committed in this District.

22. On information and belief, Garmin also uses the Accused Products at the Lincoln Road store within the meaning of 35 U.S.C. § 271(a). Garmin personnel at the store pair Accused Products to smartphones running the Garmin Connect application, set up customer accounts, register devices, install software updates, and synchronize device data with Garmin's servers. Each of those operations places the portable device, the terminal, and the communications network node into the configuration recited in the asserted claims, and each therefore constitutes a use of

---

[2] *See* Ex. 13, *Garmin Retail Stores*, GARMIN, https://www.garmin.com/en-US/company/locations/stores/ (last visited Sept. 9, 2026).

the claimed inventions in this District.

23. On information and belief, Garmin imports the Accused Products into the United States and distributes them to the Lincoln Road store for sale in this District.

24. Venue is additionally proper as to Garmin Ltd. under 28 U.S.C. § 1391(c)(3), because Garmin Ltd. is not a resident of the United States and may be sued in any judicial district.

## THE IOENGINE PATENTS-IN-SUIT

### A. The Patents-in-Suit

25. U.S. Patent No. 9,059,969 ("the '969 patent") was filed on August 6, 2013 and issued on June 16, 2015. U.S. Patent No. 10,447,819 ("the '819 patent") was filed on September 22, 2017 and issued on October 15, 2019. U.S. Patent No. 10,397,374 ("the '374 patent") was filed on September 22, 2017 and issued on August 27, 2019. U.S. Patent No. 10,992,786 ("the '786 patent") was filed on July 18, 2019 and issued on April 27, 2021. Each of the four patents is titled "Apparatus, Method and System for a Tunneling Client Access Point," and each names Scott McNulty as its sole inventor. The '969, '819,'374, and '786 patents are referred to collectively as the "Patents-in-Suit."[3] True and correct copies of the '969, '819,'374, and '786 patents are attached as Exhibits 1, 2, 3, and 4, respectively.

26. The Patents-in-Suit are members of a single patent family and share a common specification. The application that issued as the '969 patent, U.S. Patent Application Ser. No. 13/960,514, was a continuation of U.S. Patent Application Ser. No. 12/950,321, filed November 19, 2010 (issued as U.S. Patent No. 8,539,047), which was a continuation of U.S. Patent Application Ser. No. 10/807,731, filed March 23, 2004 (issued as U.S. Patent No. 7,861,006). The applications that issued as the '819 and '374 patents, U.S. Patent Application Ser. Nos. 15/712,780

[3] Specification citations are to the '969 patent, though all patents have corresponding disclosures.

and 15/712,714, were each a continuation of U.S. Patent Application Ser. No. 14/721,540, filed May 26, 2015 (issued as U.S. Patent No. 9,774,703), which was a continuation of the application that issued as the '969 patent. The '786 patent issued from U.S. Patent Application Ser. No. 16/516,244, filed July 18, 2019, a continuation in the same chain. Each of the Patents-in-Suit therefore claims priority to the application filed on March 23, 2004.

27. IOENGINE owns all rights and title to the Patents-in-Suit, including the right to recover damages for past infringement. Each of the Patents-in-Suit is valid and enforceable.

**B. The State Of Portable Computing When Mr. McNulty Filed His Application**

28. The specification of the Patents-in-Suit opens by describing the trend that prompted the invention: "[c]omputing devices have been becoming smaller over time."[4] In the early 2000s, the smallest computing devices were personal digital assistants, which "usually come with a touch screen, an input stylus and/or mini keyboard, and battery source" and "typically, have storage capacities around 64 MB."[5]

29. Those devices were an unsatisfying compromise. As the specification explains, although portable computing systems existed, "no effective solution to securely access, execute, and process data [wa]s available in an extremely compact form."[6] PDAs, "which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user interfaces, and require too much power to maintain their data."[7]

30. They were also expensive and constrained. "Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces

[4] *See* Ex. 1, '969 patent, at 1:19.

[5] *See id.* at 1:21-24.

[6] *See id.* at 2:26-28.

[7] *See id.* at 2:28-31.

and operating systems," and "current PDAs are generally limited in the amount of data they can store or access."[8]

31. The specification identifies the gap that no one had filled. "No solution exist[ed] that allow[ed] users to employ traditional large user interfaces they are already comfortable with, provide[d] greater portability, provide[d] greater memory footprints, dr[ew] less power, and provide[d] security for data on the device."[9] Solving all five of those problems at once, in a device small enough to carry in a pocket, is the technical problem to which the Patents-in-Suit are directed.

**C. Mr. McNulty's Invention**

32. Mr. McNulty's solution, which the specification calls a tunneling client access point or "TCAP," inverted the conventional relationship between a small device and a large one. Rather than build a better small screen, the portable device borrows a large one. The disclosed TCAP "is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer,"[10] "through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources."[11]

33. Because the portable device supplies its own storage and processing, it does not need the power and complexity that made PDAs bulky: "the TCAP requires no power source to maintain its data and allows for a highly portable 'thumb' footprint."[12] The specification describes the result as a technical advance, stating that "the above-identified problems of limited computing

---

[8] *See* Ex. 1, '969 patent, at 2:31-35.
[9] *See id.* at 2:35-39.
[10] *See id.* at 2:39-42.
[11] *See id.* at 2:43-46.
[12] *See id.* at 2:46-48.

devices are overcome and a technical advance is achieved in the art of portable computing and data access."[13]

34. The larger device that supplies the user interface is what the specification calls an access terminal, and what the claims call a terminal. It may be "any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like."[14] Indeed, "[t]he type of AT used is not important other than the device should provide a compatible mechanism of engagement to the TCAP and provide an operating environment for the user to engage the TCAP through the AT."[15]

35. The specification describes several ways for the portable device to connect to the terminal, and it is not limited to a physical connection. In one embodiment "the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT."[16] In others, "the TCAP may employ Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped,"[17] and "the TCAP may use Bluetooth to establish a wireless connection with a number of ATs" or "may employ WiFi."[18]

36. Once connected, program code delivered by the portable device drives an interactive user interface on the terminal's screen. In an embodiment, the terminal "provides Java and/or Windows runtime environments, which allows the TCAP to interact with the input/output

---

[13] *See* Ex. 1, '969 patent, at 2:52-55.
[14] *See id.* at 3:46-49.
[15] *See id.* at 3:49-52.
[16] *See id.* at 3:53-54.
[17] *See id.* at 3:55-57.
[18] *See id.* at 5:41-43.

mechanisms of the AT,"[19] the user is "presented with a login prompt" on the terminal's display,[20] and "[o]nce the TCAP has engaged with an AT, it can provide the user with access to its storage and processing facilities."[21]

37. The invention also reaches beyond the terminal to resources on a communications network. "If the AT is connected to a communication network 113, the TCAP may then communicate beyond the AT,"[22] and "the TCAP can provide extended storage and/or processing resources by engaging servers" across that network.[23] To the user, "the contents of the TCAP 130 appear on the AT as being contained on the TCAP 125 even though much of the contents may actually reside on the servers 115, 120 and/or the servers' storage facilities 105."[24]

38. Tunneling can be used to preserve the security of the data the portable device carries. "[T]he TCAP 'tunnels' data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT."[25] And "the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O."[26] By "providing the equivalent of a plug-n-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data in an easy and secure manner that was unavailable in the prior art."[27]

39. The claims of the Patents-in-Suit capture three related architectures drawn from

---

[19] *See* Ex. 1, '969 patent, at 3:57-60.

[20] *See id.* at 4:39.

[21] *See id.* at 3:62-63.

[22] *See id.* at 3:64-65.

[23] *See id.* at 3:66-67.

[24] *See id.* at 4:21-24.

[25] *See id.* at 4:25-27.

[26] *See id.* at 4:27-30.

[27] *See id.* at 2:48-51.

that disclosure. In the first, the portable device reaches a communications network node through the network connection of the terminal. In the second, the portable device reaches the network node over a network connection of its own. In the third, it can do either. The ’969 patent claims the first architecture, the ’819 patent claims the second, and the ’374 and ’786 patents claim the second and third.

## COMPLIANCE WITH 35 U.S.C. § 287

40. IOENGINE has complied with the marking requirements of 35 U.S.C. § 287 with respect to each of the Patents-in-Suit, to the extent they apply.

41. IOENGINE did not itself make, use, offer for sale, sell, or import any product that practices any of the Patents-in-Suit after the issuance of each of the respective Patents-in-Suit. IOENGINE therefore has no marking obligation of its own under 35 U.S.C. § 287.

42. IOENGINE has granted a single license to Interactive Media Corporation (“IMC”), which sells secure USB storage devices under the Kanguru brand name. That license, entered into in May 2018, contains a marking requirement.

43. On information and belief, IMC has marked all of its products that practice any of the Patents-in-Suit—including, as relevant here, the Kanguru Defender line of secure memory devices with the ’969 patent—continuously since the license was entered into. IMC marks those products in accordance with 35 U.S.C. § 287(a) by including the word “Pat.” together with the internet address https://www.kanguru.com/pages/our-partners on the product packaging. That webpage identifies IOENGINE patents, including the ’969 patent, and associates it with the licensed products.[28] IOENGINE has made reasonable efforts to monitor the marking of these

[28] Ex. 14, *Our Partners*, KANGURU, https://www.kanguru.com/pages/our-partners (last visited Sept. 8, 2026) (also referencing IOENGINE’s website, IOENGINE.com).

products. On information and belief, neither the Kanguru Defender products nor other IMC products practice the ’819, ’374, or ’786 patents.

44. On information and belief, there are no other products sold for or under IOENGINE besides IMC’s Kanguru Defender products that practice any of the Patents-in-Suit or are subject to a marking requirement. IOENGINE has thus complied with the marking requirements of 35 U.S.C. § 287 with respect to each of the Patents-in-Suit, to the extent they apply. Further, IOENGINE has provided constructive notice of the ’969 patent under 35 U.S.C. § 287(a) and is entitled to recover damages for infringement occurring up to six years before the filing of this Complaint, as provided by 35 U.S.C. § 286.

**ACCUSED PRODUCTS**

45. The “Accused Products” are Garmin’s smartwatches and fitness bands, including without limitation the Venu, Vivoactive, Lily, Fenix, Vivomove, Bounce, Vivofit, Vivofit jr., Vivosmart, Forerunner, Instinct, Tactix, Enduro, MARQ, Approach, Descent, Quatix, D2, and Garmin Swim lines of products, together with the Garmin Connect application and the Garmin servers and services with which those products communicate. All Garmin smartwatches and fitness bands are exemplary, though the Garmin Fenix E and Fenix 5 smartwatches are primarily analyzed herein.[29]

46. Wearable devices are central to Garmin’s business. Garmin reported record consolidated revenue of $7.25 billion for fiscal year 2025, a 15% increase over the prior year, with record full-year revenue in every segment, and it shipped more than 20 million units during the

[29] Ex. 6, *fēnix E – Premium Multisport Smartwatch*, GARMIN, https://www.garmin.com/en-US/p/1652337 (last visited Sept. 8, 2026); Ex. 16, *fēnix 5 – Multisport GPS Watch*, GARMIN, https://www.garmin.com/en-US/p/552982/ (last visited Sept. 19, 2026).

year.[30]

47. Each of the Accused Products is a portable device. Each contains a processor, memory storing executable program code, and one or more communication interfaces that enable it to communicate with a smartphone using Wi-Fi, Bluetooth, or ANT+, and, on Wi-Fi-equipped models, to communicate directly with Garmin's servers and third-party servers over a wireless network.[31]

48. The Accused Products are designed to be used with a smartphone (or other computing device, such as a tablet, laptop, or desktop computer) running the Garmin Connect application. Garmin describes the Garmin Connect app as the user's "go-to tool for analyzing and sharing health and fitness activities tracked by your Garmin device," available "[o]n mobile or web." Through the app, a user can customize the layout of displayed metrics, review tracked activities, analyze health statistics, follow adaptive training plans, "[c]reate custom workouts and send them to your watch," download courses for rides and runs and "send [them] to your device," and sync animated exercise videos "to your watch."[32]

49. A smartphone running the Garmin Connect app is a terminal within the meaning of the Patents-in-Suit. It necessarily has a processor; an input component and an output component, namely its touchscreen; a network communication interface, namely its Wi-Fi and cellular radios; and a memory storing executable program code, namely the Garmin Connect application, which when executed by the smartphone's processor presents a graphical interactive user interface on the

[30] Ex. 5, *Garmin announces fourth quarter and fiscal year 2025 results*, GARMIN (Feb. 18, 2026), https://www.garmin.com/en-US/newsroom/press-release/corporate/garmin-announces-fourth-quarter-and-fiscal-year-2025-results/.

[31] Ex. 6, *fēnix E – Premium Multisport Smartwatch*, GARMIN, https://www.garmin.com/en-US/p/1652337 (last visited Sept. 8, 2026).

[32] Ex. 7, *Garmin Connect App*, GARMIN, https://www.garmin.com/en-US/p/125677/ (last visited Sept. 8, 2026).

smartphone's touchscreen.[33]

50. Garmin instructs users to pair an Accused Product to a smartphone through the Garmin Connect app rather than through the phone's Bluetooth settings: "To ensure a stable connection for notifications and syncing, you must pair your watch directly through the Garmin Connect app."[34] The pairing process establishes a communications link between the Accused Product and the smartphone, and the Accused Product executes program code to establish and maintain that link.

51. Once paired, the Accused Products exchange data with Garmin's servers. Garmin explains that a user "can sync your device data to your Garmin Connect account using the Garmin Connect app on a mobile device or the Garmin Express software on a personal computer," and identifies the available methods: over Bluetooth, where "[i]f your device is compatible with the Garmin Connect app, you can pair and sync your device wirelessly"; over Wi-Fi, "[i]f your device is Wi-Fi compatible"; over a USB data cable; and, on older devices, using an ANT+ stick.[35]

52. When an Accused Product syncs over Bluetooth or ANT+, it reaches Garmin's servers and third-party servers through the network connection of the paired smartphone. The Accused Product does not itself connect to the Internet in that configuration; it uses the smartphone as the conduit to the communications network, exactly as the Patents-in-Suit describe.

53. Wi-Fi-equipped Accused Products also reach the network over their own network connection. Garmin states that "Garmin watches and Edge cycling computers with Wi-Fi can

---

[33] Ex. 8, *Garmin Connect App – Compatible Devices*, GARMIN, https://www.garmin.com/en-US/p/125677/#devices (last visited Sept. 8, 2026).

[34] Ex. 9, *Pairing Your Watch to the Garmin Connect App*, GARMIN, https://support.garmin.com/en-US/?faq=nvCECLZzFu7UzXdBlDlVY5 (last visited Sept. 8, 2026).

[35] Ex. 10, *Syncing Device Data to Garmin Connect*, GARMIN, https://support.garmin.com/en-US/?faq=tcCwdhjywt9nIwSdeIlIt9 (last visited Sept. 8, 2026).

automatically upload your activities and download software updates when they're connected to a saved Wi-Fi network."[36]

54. The user interface that the Garmin Connect app presents on the smartphone is interactive, and the user's interaction with it controls the Accused Product. A user manipulates elements of that interface to pair the watch and the smartphone, to update the software on the watch, to set notifications and alerts, to modify health and fitness data, and to select content to be downloaded to or synchronized with the watch.[37] Each of those interactions causes the smartphone to transmit a communication to the Accused Product, which in turn causes program code stored on the Accused Product to be executed by the Accused Product's processor.

55. Execution of that program code causes the Accused Product to transmit a communication to Garmin's servers or third-party servers, either through the smartphone's network connection or over the Accused Product's own Wi-Fi connection. Those servers are communications network nodes, and they include databases in which Garmin stores the user's profile, activity, and health data.

56. The communications between the Accused Products, the smartphone, and Garmin's servers are secure. On information and belief, those communications are protected using encryption protocols, including Transport Layer Security for communications carried over the Internet and the link-layer encryption specified by the Wi-Fi and Bluetooth standards, and the responses returned from Garmin's servers to the smartphone are likewise encrypted.

57. The result of these communications is the synchronization of content on the

---

[36] Ex. 11, *Setting Up Wi-Fi on a Watch or Edge Cycling Computer*, GARMIN, https://support.garmin.com/en-US/?faq=86QHylLwpf6iG9UtYr4fY7 (last visited Sept. 8, 2026).

[37] Ex. 7, *Garmin Connect App*, GARMIN, https://www.garmin.com/en-US/p/125677/ (last visited Sept. 8, 2026).

Accused Product with content stored in Garmin's databases. Garmin's Physio TrueUp feature, for example, transfers "[u]ser profile information, heart rate" and related physiological data between a user's Garmin devices through the user's Garmin Connect account.[38] Software updates, notification and alert settings, health and fitness data, courses, workouts, and other selected content are likewise synchronized between the Accused Product and Garmin's servers.

58. Execution of program code on the Accused Product also affects what the Garmin Connect app displays on the smartphone's touchscreen. After a user pairs a device, updates its software, changes a notification setting, modifies health and fitness data, or selects content to be downloaded to the watch, the smartphone's display is updated to reflect that the action has been completed.

## ALLEGATIONS OF PATENT INFRINGEMENT

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 9,059,969

59. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

60. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '969 patent, including the right to recover damages for past infringement. The '969 patent is valid and enforceable.

61. On information and belief, Garmin has infringed the '969 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 4 and 10 of the '969 patent, including with respect to the Accused Products. Garmin's infringement

[38] Ex. 12, *Physio TrueUp*, GARMIN, https://support.garmin.com/en-US/?faq=fLogiPl4Vr5p8u0bFNWmK7 (last visited Sept. 8, 2026).

dates from at least six years prior to the filing of this Complaint until the expiration of the ’969 patent on April 10, 2024. On information and belief, in relevant respects for the Accused Products, Garmin Ltd., Garmin International, Inc., and Garmin USA, Inc. acted in concert with one another.

62. During the infringing time period, the Accused Products met every limitation of claim 1 of the ’969 patent, which recites:

> 1. A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:
>
> (a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;
>
> (b) a processor; and
>
> (c) a memory having executable program code stored thereon, including:
>
> (1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and
>
> (2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;
>
> wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

63. Each Accused Product was a portable device configured to communicate with a terminal. Garmin’s smartwatches and fitness bands are worn on the wrist, and they are configured to communicate with smartphones using Wi-Fi, Bluetooth, or ANT+. A smartphone running the

Garmin Connect app can be used to interact with and manage a Garmin smartwatch.[39]

64. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. A smartphone paired with an Accused Product necessarily has a processor, input and output components in the form of a touchscreen, a network communication interface in the form of Wi-Fi and cellular radios, and a memory storing executable program code.

65. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component. The Garmin Connect application, when executed by the smartphone's processor, presents an interactive user interface on the smartphone's touchscreen through which the user controls the paired Garmin device.[40]

66. Garmin instructs users to "download the Garmin Connect mobile app on a compatible smartphone and pair" it with the watch, and depicts the resulting interactive user interface on the smartphone screen:[41]

---

[39] Ex. 8, *Garmin Connect App – Compatible Devices*, GARMIN, https://www.garmin.com/en-US/p/125677/#devices (last visited Sept. 8, 2026).

[40] Ex. 7, *Garmin Connect App*, GARMIN, https://www.garmin.com/en-US/p/125677/ (last visited Sept. 8, 2026).

[41] *Garmin fenix 5 and 5S: Enhancing Your Watch with Connect IQ*, GARMIN, at 0:28 (YouTube, Mar. 14, 2017), https://youtu.be/-7B4vV9nNfs.




67. The terminal memory also stored second program code which, when executed by the terminal processor, provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. A smartphone connected to a Garmin smartwatch using the Garmin Connect app necessarily executes code that provides such a communications node, which passes communications to the smartwatch over Bluetooth, ANT+, or Wi-Fi and to Garmin's servers over the smartphone's Wi-Fi or cellular connection.

68. Each Accused Product had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, namely its Wi-Fi, Bluetooth, and ANT+ radios, which Garmin identifies as the means by which its watches pair and sync with the Garmin Connect app.[42]

69. Each Accused Product had a processor and a memory having executable program

[42] Ex. 10, *Syncing Device Data to Garmin Connect*, GARMIN, https://support.garmin.com/en-US/?faq=tcCwdhjywt9nIwSdeIlIt9 (last visited Sept. 8, 2026).

code stored thereon. Garmin smartwatches necessarily contain processors and memory storing the executable code that runs the watch, records activity data, communicates with the paired smartphone, and receives and installs software updates.

70. The memory of each Accused Product stored third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network communication interface. Garmin instructs users to pair the watch "directly through the Garmin Connect app,"[43] and the resulting link enables the watch to send messages to Garmin's servers and third-party servers using the smartphone's Internet connection. This occurs, for example, when pairing the smartwatch and smartphone, updating the software on the smartwatch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.

71. The memory of each Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When a user interacts with the touchscreen of a smartphone connected to a Garmin smartwatch through the Garmin Connect app, the smartphone sends a message to the smartwatch, which in turn causes code on the smartwatch to execute, including code that causes a message to be sent to Garmin's servers or third-party servers using the smartphone's Internet connection.

---

[43] Ex. 9, *Pairing Your Watch to the Garmin Connect App*, GARMIN, https://support.garmin.com/en-US/?faq=nvCECLZzFu7UzXdBlDlVY5 (last visited Sept. 8, 2026).

72. Each Accused Product was configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node, as described in the preceding paragraphs. Garmin's servers and the third-party servers with which the Accused Products communicate are communications network nodes.

73. The Accused Products also met every limitation of claim 4 of the '969 patent, which depends from claim 2 and recites "wherein the communication caused to be transmitted to the communication network node facilitates the transmission of encrypted communications from the communication network node to the terminal." Communications transmitted from the smartphone to Garmin's servers and third-party servers, which the Accused Products' program code caused to be transmitted, facilitate the transmission of encrypted communications from those servers back to the smartphone.

74. The Accused Products also met every limitation of claim 10 of the '969 patent, which depends from claim 2 and recites "wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database." The messages sent to Garmin's servers and third-party servers facilitate synchronizing content on the Garmin smartwatch with content in Garmin's databases, such as when updating the software on the smartwatch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.[44]

75. On information and belief, and for all the reasons above, Garmin infringed at least claims 1, 4, and 10 of the '969 patent.

---

[44] Ex. 12, *Physio TrueUp*, GARMIN, https://support.garmin.com/en-US/?faq=fLogiPl4Vr5p8u0bFNWmK7 (last visited Sept. 8, 2026).

76. As a result of Garmin's infringement of the '969 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Garmin's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 10,447,819**

77. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

78. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '819 patent, including the right to recover damages for past infringement. The '819 patent is valid and enforceable.

79. On information and belief, Garmin has infringed the '819 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claim 184 of the '819 patent, including with respect to the Accused Products. Garmin's infringement dates from at least six years prior to the filing of this Complaint until the expiration of the '819 patent on March 23, 2024. On information and belief, in relevant respects for the Accused Products, Garmin Ltd., Garmin International, Inc., and Garmin USA, Inc. acted in concert with one another.

80. During the infringing time period, the Accused Products met every limitation of at least claim 184 of the '819 patent, which recites:

> 184. A portable device configured to communicate with a communications network comprising a communications network node and with a terminal comprising an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device, the portable device comprising:
>
> a. a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein

the communications comprise data content transmitted from the communications network node to the portable device;

b. a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal;

c. a processor configured to stream data content for presentation by the terminal output component; and

d. a memory having executable program code stored thereon, including:

i. first program code which, when executed, presents an interactive user interface on the terminal output component, receives a command resulting from user manipulation of a user interface element of the interactive user interface, and causes a communication to the portable device processor in response to the command resulting from user manipulation of a user interface element of the interactive user interface;

ii. second program code which, when executed by the portable device processor, enables the portable device to communicate with the communications network node;

iii. third program code which, when executed by the portable device in response to a command resulting from user manipulation of a user interface element of the interactive user interface, causes a communication to be transmitted through the portable device network interface to the communications network node; and

iv. fourth program code which, when executed by the portable device, processes data content received from the communications network node through the portable device network interface for transmission through the communications interface to the terminal and presentation by the terminal output component.

81. Each Accused Product was a portable device configured to communicate with a communications network comprising a communications network node and with a terminal. As described above, Garmin smartwatches and fitness bands communicate with Garmin's servers and third-party servers, which are communications network nodes, and they communicate with smartphones running the Garmin Connect app, which are terminals.[45]

82. The terminal comprised an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a

---

[45] Ex. 10, *Syncing Device Data to Garmin Connect*, GARMIN, https://support.garmin.com/en-US/?faq=tcCwdhjywt9nIwSdeIlIt9 (last visited Sept. 8, 2026).

user to enable control of the portable device. The Garmin Connect app presents such an interface on the smartphone touchscreen, and the user controls the paired Garmin device through it by pairing the devices, updating the software on the watch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the watch.[46]

83. Each Accused Product had a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device. Wi-Fi-equipped Garmin smartwatches communicate with Garmin's servers over Wi-Fi, and Garmin states that such devices "can automatically upload your activities and download software updates when they're connected to a saved Wi-Fi network."[47] Data content transmitted from Garmin's servers to the watch includes software updates, courses, workouts, animated exercise videos, and other content selected by the user.

84. Each Accused Product had a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal. Garmin smartwatches communicate with paired smartphones over Bluetooth, ANT+, and Wi-Fi, and stream recorded activity, health, and status data to the Garmin Connect app on the smartphone, including in real time during an activity.[48]

---

[46] Ex. 7, *Garmin Connect App*, GARMIN, https://www.garmin.com/en-US/p/125677/ (last visited Sept. 8, 2026).

[47] Ex. 11, *Setting Up Wi-Fi on a Watch or Edge Cycling Computer*, GARMIN, https://support.garmin.com/en-US/?faq=86QHylLwpf6iG9UtYr4fY7 (last visited Sept. 8, 2026).

[48] Ex. 10, *Syncing Device Data to Garmin Connect*, GARMIN, https://support.garmin.com/en-US/?faq=tcCwdhjywt9nIwSdeIlIt9 (last visited Sept. 8, 2026).

85. Each Accused Product had a processor configured to stream data content for presentation by the terminal output component. Garmin smartwatches necessarily have processors, and that processor streams activity and health data to the Garmin Connect app for presentation on the smartphone touchscreen. Garmin's LiveTrack feature is exemplary: it lets "friends and family follow your training and fitness activities in real time."[49]

86. A teardown of the Garmin Fenix 5 smartwatch shows the processor and memory on the device's circuit board. On information and belief, the device includes an NXP Kinetis K28 Arm Cortex-M4-based application processor, or its equivalent:[50]



87. Each Accused Product had a memory having executable program code stored thereon, including first program code which, when executed, presents an interactive user interface on the terminal output component, receives a command resulting from user manipulation of a user interface element of that interface, and causes a communication to the portable device processor in response. The Garmin Connect app presents the interface on the smartphone, receives the user's commands, and sends the resulting communication to the watch.

---

[49] Ex. 7, *Garmin Connect App*, GARMIN, https://www.garmin.com/en-US/p/125677/ (last visited Sept. 8, 2026).

[50] *See* Ex. 17, Brian Dipert, *Teardown: A smartwatch with an athletic tradition*, EDN, https://www.edn.com/teardown-a-smartwatch-with-an-athletic-tradition/ (last visited Sept. 9, 2026).

88. The memory of each Accused Product also stored second program code which, when executed by the portable device processor, enabled the portable device to communicate with the communications network node. Garmin smartwatches necessarily have code that sends messages to, and receives content from, Garmin's servers and third-party servers.

89. The memory of each Accused Product also stored third program code which, when executed by the portable device in response to a command resulting from user manipulation of a user interface element of the interactive user interface, caused a communication to be transmitted through the portable device network interface to the communications network node. Interacting with the Garmin Connect app on the smartphone touchscreen causes a message to be sent to the watch, which in turn causes code on the watch to execute that causes a message to be sent to Garmin's servers or third-party servers over the watch's own Wi-Fi connection. This occurs, for example, when updating the software on the smartwatch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.[51]

90. The memory of each Accused Product also stored fourth program code which, when executed by the portable device, processed data content received from the communications network node through the portable device network interface for transmission through the communications interface to the terminal and presentation by the terminal output component. When a Garmin smartwatch downloads content from Garmin's servers over its own Wi-Fi connection, code on the watch processes that content and transmits it to the paired smartphone for presentation in the Garmin Connect app. This occurs, for example, when the watch downloads a

---

[51] Ex. 11, *Setting Up Wi-Fi on a Watch or Edge Cycling Computer*, GARMIN, https://support.garmin.com/en-US/?faq=86QHylLwpf6iG9UtYr4fY7 (last visited Sept. 8, 2026).

software update, a course, or a workout and the Garmin Connect app is updated to reflect the downloaded content.

91. On information and belief, and for all the reasons above, Garmin infringed at least claim 184 of the ’819 patent.

92. As a result of Garmin’s infringement of the ’819 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Garmin’s infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 10,397,374

93. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

94. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the ’374 patent, including the right to recover damages for past infringement. The ’374 patent is valid and enforceable.

95. On information and belief, Garmin has infringed the ’374 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 1 and 3 of the ’374 patent, including with respect to the Accused Products. Garmin’s infringement dates from at least six years prior to the filing of this Complaint until the expiration of the ’374 patent on March 23, 2024. On information and belief, in relevant respects for the Accused Products, Garmin Ltd., Garmin International, Inc., and Garmin USA, Inc. acted in concert with one another.

96. During the infringing time period, the Accused Products met every limitation of at

least claim 1 of the '374 patent, which recites:

> 1. A portable device configured to communicate with a communications network, the communication network comprising (i) a communications network node, and (ii) a terminal, the terminal comprising a processor, an output component configured to present a graphical interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device, a network interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, presents the graphical interactive user interface by the terminal output component, receives a command resulting from user manipulation of a user interface element of the graphical interactive user interface, and causes a communication to be transmitted to the portable device in response to the command resulting from user manipulation of a user interface element of the graphical interactive user interface, the portable device comprising:
> (a) at least one communication interface configured to enable the transmission of communications between the portable device and the communications network;
> (b) a processor; and
> (c) a memory having executable program code stored thereon, including:
> (1) second program code which, when executed by the portable device processor, enables the portable device to cause a communication to be sent to the communications network node;
> (2) third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, causes a communication to be transmitted to the communications network node; and
> (3) fourth program code which, when executed, affects the presentation of the graphical interactive user interface by the terminal output component;
> wherein the portable device is configured to communicate with the terminal and to securely communicate with the communications network node.

97. Each Accused Product was a portable device configured to communicate with a communications network comprising a communications network node and a terminal. Garmin smartwatches and fitness bands communicate with Garmin's servers and third-party servers using their own Wi-Fi connection or by leveraging the network connection of a paired smartphone, and they communicate with smartphones using Wi-Fi, Bluetooth, or ANT+.[52]

---

[52] Ex. 10, *Syncing Device Data to Garmin Connect*, GARMIN, https://support.garmin.com/en-US/?faq=tcCwdhjywt9nIwSdeIlIt9 (last visited Sept. 8, 2026).

98. The terminal comprised a processor and an output component configured to present a graphical interactive user interface with at least one user interface element that a user manipulates to control the portable device. A smartphone running the Garmin Connect app presents such an interface on its touchscreen, and a user controls the paired Garmin smartwatch through that interface by, among other things, pairing the smartwatch and smartphone, updating the software on the smartwatch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.[53]

99. The user interface elements that the Garmin Connect application presents on the smartphone are manipulated by the user to control the paired device. Garmin depicts those elements, including its "Create Account" and "Sign In" controls, in its own instructional materials:[54]




---

[53] Ex. 7, *Garmin Connect App*, GARMIN, https://www.garmin.com/en-US/p/125677/ (last visited Sept. 8, 2026).

[54] *Garmin fenix 5 and 5S: Enhancing Your Watch with Connect IQ*, GARMIN, at 0:38 (YouTube, Mar. 14, 2017), https://youtu.be/-7B4vV9nNfs.

100. The terminal also comprised a network interface and a memory storing first program code which, when executed by the terminal processor, presented the graphical interactive user interface, received a command resulting from the user's manipulation of a user interface element, and caused a communication to be transmitted to the portable device in response. The smartphone necessarily has a Wi-Fi or cellular network connection, and the Garmin Connect app is the code that presents the interface, receives the user's commands, and sends the resulting message to the watch.

101. Each Accused Product had at least one communication interface configured to enable the transmission of communications between the portable device and the communications network. Wi-Fi-equipped Garmin smartwatches communicate with Garmin's servers and third-party servers over Wi-Fi.[55]

102. Each Accused Product had a processor and a memory having executable program code stored thereon, including second program code which, when executed by the portable device processor, enabled the portable device to cause a communication to be sent to the communications network node. Garmin smartwatches necessarily have code that sends messages to Garmin's servers and third-party servers using a Wi-Fi connection.

103. The memory of each Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, caused a communication to be transmitted to the communications network node. Interacting with the touchscreen of a smartphone connected to a Garmin smartwatch through the

---

[55] Ex. 11, *Setting Up Wi-Fi on a Watch or Edge Cycling Computer*, GARMIN, https://support.garmin.com/en-US/?faq=86QHylLwpf6iG9UtYr4fY7 (last visited Sept. 8, 2026).

Garmin Connect app causes a message to be sent to the smartwatch, which in turn causes code on the smartwatch to execute that causes a message to be sent to Garmin's servers or third-party servers.

104. The memory of each Accused Product also stored fourth program code which, when executed, affected the presentation of the graphical interactive user interface by the terminal output component. Garmin smartwatches have code that, when executed, affects what is displayed on the touchscreen of the connected smartphone. After the user pairs the devices, updates the watch software, sets notifications and alerts, modifies health and fitness data, or selects content to be downloaded to the watch, the smartphone display is updated to reflect that the action has been completed.

105. Each Accused Product was configured to communicate with the terminal and to securely communicate with the communications network node. Garmin smartwatches communicate with smartphones through the Garmin Connect app via Bluetooth, ANT+, or Wi-Fi, and communicate securely with Garmin's servers and third-party servers over encrypted connections.

106. The Accused Products also met every limitation of claim 3 of the '374 patent, which depends from claim 1 and recites "wherein the third program code, when executed by the portable device processor, causes a secure communication to be transmitted through the terminal network interface to the communications network node." When a user interacts with the Garmin Connect app on the smartphone touchscreen, the resulting message to the smartwatch causes code on the smartwatch to execute that causes a secure message to be sent to Garmin's servers or third-party servers using the Internet connection of the smartphone. This occurs, for example, when pairing the smartwatch and smartphone, updating the software on the smartwatch, setting notifications and

alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.

107. Claim 3 of the ’374 patent captures the architecture in which the portable device uses both its own network connection and the network connection of the terminal. The Accused Products practiced that architecture: Wi-Fi-equipped Garmin smartwatches reach Garmin’s servers directly over their own Wi-Fi connection, and they also reach those same servers through the network connection of the paired smartphone when Wi-Fi is unavailable or when the user acts through the Garmin Connect app.[56]

108. On information and belief, and for all the reasons above, Garmin infringed at least claims 1 and 3 of the ’374 patent.

109. As a result of Garmin’s infringement of the ’374 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Garmin’s infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

**COUNT IV**
**INFRINGEMENT OF U.S. PATENT NO. 10,992,786**

110. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

111. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the ’786 patent, including the right to recover damages for past infringement. The ’786 patent is valid and enforceable.

112. On information and belief, Garmin has infringed the ’786 patent in violation of 35

[56] Ex. 10, *Syncing Device Data to Garmin Connect*, GARMIN, https://support.garmin.com/en-US/?faq=tcCwdhjywt9nIwSdeIlIt9 (last visited Sept. 8, 2026).

U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 1 and 20 of the ’786 patent, including with respect to the Accused Products. Garmin’s infringement dates from at least six years prior to the filing of this Complaint until the expiration of the ’786 patent on April 13, 2024. On information and belief, in relevant respects for the Accused Products, Garmin Ltd., Garmin International, Inc., and Garmin USA, Inc. acted in concert with one another.

113. During the infringing time period, the Accused Products met every limitation of at least claim 1 of the ’786 patent, which recites:

> 1. A portable device configured to communicate with (i) a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to receive a command resulting from user manipulation of a user interface element of the interactive user interface, affect the presentation of the interactive user interface by the terminal output component in response to the command resulting from user manipulation of a user interface element, and cause a communication to be transmitted from the terminal to the portable device in response to the command resulting from user manipulation of a user interface element and (ii) a communications network comprising a plurality of communications network nodes, the portable device comprising:
>
> (a) a first communication interface configured to enable transmission of communications between the portable device and the terminal;
>
> (b) a second communication interface configured to enable transmission of communications between the portable device and a communications network node;
>
> (c) a processor; and
>
> (d) a memory having executable program code stored thereon, including
>
> (1) second program code which, when executed by the portable device processor, is configured to facilitate communications through the second communication interface between the portable device and the communications network node; and
>
> (2) third program code which, when executed by the portable device processor in response to a communication received by the portable device from the terminal resulting from user manipulation of a user interface element of the interactive user interface presented by the terminal output component, is configured to cause a communication to be transmitted

> through the second communication interface to the communications network node.

114. Each Accused Product was a portable device configured to communicate with a terminal and with a communications network comprising a plurality of communications network nodes. As described above, Garmin smartwatches and fitness bands communicate with smartphones running the Garmin Connect app, which are terminals, and with Garmin's servers and third-party servers, which are communications network nodes.[57]

115. The terminal comprised a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory configured to store executable program code. A smartphone running the Garmin Connect app necessarily has a processor and a touchscreen, and the Garmin Connect application stored in the smartphone's memory presents an interactive user interface on that touchscreen.[58]

116. The terminal memory stored first program code which, when executed by the terminal processor, received a command resulting from user manipulation of a user interface element of the interactive user interface, affected the presentation of that interface in response, and caused a communication to be transmitted from the terminal to the portable device in response. The Garmin Connect app performs each of those functions when the user pairs the watch and the smartphone, updates the software on the watch, sets notifications and alerts, modifies health and fitness data, or selects content to be downloaded to or synchronized with the watch.[59]

117. Each Accused Product had a first communication interface configured to enable

---

[57] *See* Ex. 8.

[58] *See* Ex. 7.

[59] *See id.*

transmission of communications between the portable device and the terminal. Garmin smartwatches communicate with paired smartphones over Bluetooth and ANT+, and Garmin instructs users that "[t]o ensure a stable connection for notifications and syncing, you must pair your watch directly through the Garmin Connect app."[60]

118. Each Accused Product had a second communication interface configured to enable transmission of communications between the portable device and a communications network node. Wi-Fi-equipped Accused Products carry a Wi-Fi radio through which the device communicates directly with Garmin's servers. Garmin states that "Garmin watches and Edge cycling computers with Wi-Fi can automatically upload your activities and download software updates when they're connected to a saved Wi-Fi network."[61]

119. The first and second communication interfaces are separate, and the second does not depend on the first. Garmin's owner's manual for the Fenix 5 states that "[s]ome fēnix 5/5S models have Wi-Fi connected features" and that "[t]he Garmin Connect Mobile app is not required for you to use Wi-Fi connectivity."[62]

120. Garmin identifies those Wi-Fi connected features as "[a]ctivity uploads to your Garmin Connect account," which "[a]utomatically sends your activity to your Garmin Connect account as soon as you finish recording the activity"; "[w]orkouts and training plans," which the user selects "on the Garmin Connect site" and which are "wirelessly sent to your device" the "next time your device has a Wi-Fi connection"; and "[s]oftware updates," which allow "your device to

---

[60] *See* Ex. 9.

[61] *See* Ex. 11.

[62] Ex. 15, *fēnix 5/5S Owner's Manual – Wi-Fi Connected Features*, GARMIN, https://www8.garmin.com/manuals/webhelp/fenix5/EN-US/GUID-68E2DE6D-85A9-4A26-8D88-D3A8FF78D5E3.html (last visited Sept. 19, 2026).

download the latest software update when a Wi-Fi connection is available."[63]

121. The Fenix 5 is exemplary. Garmin states that the Fenix 5 "Sapphire editions feature a scratch-resistant sapphire lens and are also Wi-Fi® enabled," and the same device communicates with a paired smartphone over Bluetooth and ANT+.[64]

122. Each Accused Product had a processor and a memory having executable program code stored thereon, as described above.

123. The memory of each Accused Product stored second program code which, when executed by the portable device processor, facilitated communications through the second communication interface between the portable device and the communications network node. A Wi-Fi-equipped Accused Product necessarily executes program code stored on the device that joins a saved Wi-Fi network and that uploads activities and downloads software updates, workouts, and training plans over that connection.[65]

124. The memory of each Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received by the portable device from the terminal resulting from user manipulation of a user interface element of the interactive user interface presented by the terminal output component, caused a communication to be transmitted through the second communication interface to the communications network node. When a user manipulates the Garmin Connect app on the smartphone touchscreen, for example to update the software on the watch, to set notifications and alerts, to modify health and fitness data, or to select content to be downloaded to or synchronized with the watch, the smartphone transmits a communication to the watch, and program code on the watch then executes and causes a

[63] *See* Ex. 15.
[64] *See* Ex. 16.
[65] *See* Ex. 15.

communication to be transmitted over the watch's own Wi-Fi connection.[66]

125. On information and belief, and for all the reasons above, Garmin infringed at least claim 1 of the '786 patent.

126. The Accused Products also met every limitation of claim 20 of the '786 patent, which depends from claim 1 and recites "wherein the terminal further comprises a network interface and the portable device is configured to transmit a communication through the terminal network interface to a communications network node." A smartphone running the Garmin Connect app has a network interface, namely its Wi-Fi and cellular radios, and the Accused Products transmit communications to Garmin's servers and third-party servers through that interface. Garmin explains that a user "can sync your device data to your Garmin Connect account using the Garmin Connect app on a mobile device" and that "[i]f your device is compatible with the Garmin Connect app, you can pair and sync your device wirelessly."[67]

127. Claim 20 therefore covers the architecture in which the portable device uses both its own network connection, as required by claim 1, and the network connection of the terminal. The Accused Products practiced that architecture: Wi-Fi-equipped Garmin smartwatches reach Garmin's servers directly over their own Wi-Fi connection, and they also reach those same servers through the network connection of the paired smartphone when Wi-Fi is unavailable or when the user acts through the Garmin Connect app.[68]

128. On information and belief, and for all the reasons above, Garmin infringed at least claims 1 and 20 of the '786 patent.

As a result of Garmin's infringement of the '786 patent, IOENGINE has been damaged.

---

[66] *See* Ex. 11.

[67] *See* Ex. 10.

[68] *See id.*

IOENGINE is entitled to recover damages adequate to compensate it for Garmin's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## DEMAND FOR JURY TRIAL

129. IOENGINE hereby demands a jury trial on its claims for patent infringement and any and all issues triable of right before a jury.

## PRAYER FOR RELIEF

WHEREFORE, IOENGINE prays for judgment as follows:

A. That Garmin infringed the '969, '819, '374, and '786 patents;

B. That Garmin be required to pay IOENGINE's damages in an amount adequate to compensate IOENGINE for Garmin's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284, as well as any other damages awarded under 35 U.S.C. § 284, with an accounting as needed;

C. That IOENGINE be awarded all statutory and actual damages to which it is entitled, and prejudgment and post-judgment interest;

D. That this case be declared exceptional under 35 U.S.C. § 285, and that IOENGINE be awarded recovery of the costs of this suit, including reasonable attorneys' fees; and

E. That IOENGINE be awarded such other and further relief as this Court deems just and proper.

Dated: September 25, 2026

Respectfully submitted,

*/s/ Albert Alvarez*
Steven I. Peretz (Fla. Bar No. 329037)
speretz@pch-iplaw.com
Michael B. Chesal (Fla. Bar No. 775398)
mchesal@pch-iplaw.com
Albert Alvarez (Fla. Bar No. 106859)
aalvarez@pch-iplaw.com
Peretz Chesal & Herrmann, P.L.
One Biscayne Tower
2 S. Biscayne Blvd.
Suite 3200
Miami, Florida 33131
T: (305) 341-3000

*Attorneys for Plaintiff IOENGINE, LLC*